## WYSONG, In Re

Ohio Appeals, 2nd Dist, Montgomery Co

No. 1564. Decided July 7, 1939

Joseph W. Sharts, Dayton, for D. H. Wysong.

Harry Jeffrey, Dayton, Robert Knee, Dayton, for Bar Association.

## OPINION

BY THE COURT:

This matter arose in the Court of Common Pleas of Montgomery County, the first entry appearing on December 27, 1937.

This entry is to the effect that representations having been made on behalf of the Dayton Bar Association that Drewey H. Wysong, an attorney at law of the Bar of the State of Ohio, engaged in practice in Montgomery County, Ohio, may be guilty of misconduct and unprofessional conduct involving moral turpitude, it is ordered that the Executive Committee of the Bar Association be appointed as a committee to prepare and present charges and specifications.

On the same day charges and specifications were ordered filed and Drewey H. Wysong was required to answer by January 29, 1938.

Afterwards amended charges were filed together with specifications.

The charges were as follows:

1. The said Drewey H. Wysong, an attorney at law as aforesaid, is guilty of misconduct in office as such attorney at law.

2. The said Drewey H. Wysong, an attorney at law as aforesaid, is guilty of unprofessional conduct in office involving moral turpitude.

Four specifications are filed but inasmuch as the trial court found that the allegations contained in the first specification have not been established by clear and convincing proof and that by reason thereof the court finds the respondent not guilty as charged in the first specification, and further, inasmuch as the fourth specification was on motion dismissed for the reason that there was a failure of service, it will not be necessary to note the purport of either the first or fourth specification.

The second specification is to the effect that on the 5th day of September, 1935, an action was filed in the Court of Common Pleas, being No. 62170, by Webster Baker, et al v Harry E. Strader, et al; the suit was on a note and sought foreclosure of a real estate mortgage; the defendant, Strader, was the owner of the property and was repre-

sented by Drewey H. Wysong as his attorney; the real estate was sold under the order of the Court to Frank P. and Clara Griesey; that Drewey H. Wysong made application for the allowance of a homestead to the defendant, Strader, out of the proceeds arising from the sale, after the mortgage had been paid. Strader had removed certain fixtures and chattel property from the real estate by reason of which he was cited for contempt before a Judge in the Court of Common Pleas; at the hearing of this citation Strader was represented by Wysong, his attorney, and was personally present in court at the time the Court ordered the restitution of the chattel property which had been removed from the real estate and further ordered that the action for allowance of a homestead would not be passed upon until the order of the Court as to such restitution had been obeyed; that upon the 28th of August, 1937, without waiting for the restoration of said property to be made and with knowledge that said restoration had not been made, the said Wysong presented an entry to another Judge of said Court allowing the homestead exemption and ordering distribution of same. This entry was presented without informing the Judge of the prior order of another Judge relating to the same property and in contempt of the former order of the Court and with intent to defraud the purchaser of the real estate.

The third specification is to the effect that on or prior to May 16, 1932, the said Drewey H. Wysong acted as attorney for Harry Grant and Isabelle Grant, who were the recorded owners of certain real estate located in Montgomery County; that on or about said date, Wysong prepared a deed conveying the real estate from said Harry Grant and Isabelle Grant to "Belle McCormack", which deed was recorded; that prior to March 30, 1934, the said Wysong was informed that Isabelle Grant and Belle McCormack were one and the same person. Wysong then prepared a special warranty deed purporting to convey the real estate from Belle McCormack to John P. House and on or about said

date went to Indianapolis and secured the signature to said deed of a woman by the name of Belle McCormack, but who was not the owner of said premises and not the Belle McCormack who was also known as Isabelle Grant, but was a washerwoman living in Indianapolis. Before signing the deed she informed Wysong that she did not own said premises but signed the deed and was paid $1.50 by Wysong for signing same. Thereafter the deed was filed by Wysong for record in Montgomery County on April 5, 1934; shortly thereafter Wysong, as attorney for John P. House, brought an action by said House, as plaintiff, in forcible entry and detainer in a court of the Justice of the Peace of Jefferson Township, Montgomery County, seeking to evict the said Harry Grant and Isabelle Grant (the latter known as Belle McCormack) from said premises; thereupon the Grants as plaintiffs commenced an action in the Court of Common Pleas against the Justice of the Peace and said John P. House to restrain the prosecution of said forcible entry and detainer action and cancel the deed executed by said Belle McCormack; said action came on for trial and resulted in a final judgment that said deed from Belle McCormack of Indianapolis to John P. House was an invalid deed and should be cancelled and that House be enjoined from molesting plaintiffs in the possession of the real estate. It is stated that Drewey H. Wysong is guilty of misconduct and unprofessional conduct in office involving moral turpitude in having prepared said deed for the signature of said Belle McCormack of Indianapolis; he having obtained her signature thereon; in paying her therefor; in filing the deed and in bringing said action as attorney for House in forcible entry and detainer.

The matter came on for trial before the Hon. Hugh R. Gilmore, Judge of the Court of Common Pleas of Preble County, sitting by designation in Montgomery County.

The Court found that the allegations of the first specification have not been established and by reason thereof the

Court found the respondent, not guilty as charged in the first specification.

As to Specifications Nos. 2 and 3 the Court found that the allegations contained in said specifications are true and that it has been established by clear and convincing evidence that the respondent was guilty of misconduct in office as an attorney at law and of unprofessional conduct in office involving moral turpitude and the Court found respondent guilty as charged in the second and third specification.

The fourth specification having been dismissed, no order was made in reference to it.

### OPINION OF THE TRIAL COURT

The Court found, in substance, that the disbarment proceedings could be maintained by reason of the misconduct alleged in the specifications; that in the charges set out in the third specification the accused was acting as an attorney and subject to disbarment proceedings and that while he testified that he was of the belief that the Belle McCormack that he found in Indianapolis was the real Belle McCormack, yet there was no reasonable ground for such belief and that after he was informed by said Belle McCormack that she had no interest in any property in Dayton, Ohio, and no relatives in Dayton and knew nothing about the matter, for him to proceed further and procure her deed to a person who apparently had no interest in the matter was misconduct and unprofessional conduct. The Court found that his explanation as to why he desired the deed was not a satisfactory explanation.

As to Specification No. 2, the Court found that the accused was acting as an attorney and knew of the order of the court in reference to the restoration of the personal property and that the Court would withhold the allowance of the homestead exemption until the property was returned and should have had definite information substantiating the claim that the property had been restored before procuring the signature to an entry practically annulling the known former order of the court, without information to opposing counsel. While there is no evidence from the Judge signing the last entry as to what was or was not said to him by the respondent, the Court concludes that had the Judge been informed fully of the facts, he would not have approved an entry until he had caused an investigation to determine whether the condition outlined by the former Judge's order had been complied with. In the opinion of the Court, such conduct was unprofessional conduct involving moral turpitude.

A motion for new trial was filed and overruled and the Court entered final judgment, that the respondent, Drewey H. Wysong, be and he hereby is disbarred and removed from the practice of law in the State of Ohio and that his name be stricken from the roll of attorneys at law in Ohio. It was ordered that the judgment shall not become operative until the determination of all proceedings on appeal or upon the expiration of the time limit for such appeal.

Notice of appeal was given from such judgment, as shown by the entry of the 19th of January, 1939. The appeal is on questions of law.

Errors are assigned by appellant to the effect,

1. That the Court erred in not sustaining the motion of the respondent to dismiss the charges at the close of the prosecution.

2 and 3. That the finding of the Court as to Specifications 2 and 3 are not sustained by sufficient evidence.

4. That the Court erred in admitting evidence.

### THE LAW

The action is founded on §§1707 and 1708, GC. The first section provides for the suspension and removal of an attorney from office "for misconduct or unprofessional conduct in office involving moral turpitude." §1708 provides for the procedure, which has been followed in this case.

A few general principles will suffice

to guide us. Some intimations appear in counsel's brief to the effect that the actions complained of must be those of which counsel is guilty in his conduct of a matter pending in Court. We think this matter is clearly settled in the case of **In re Charles A. Thatcher, 80 Oh St 492**, in which the charge was made that Thatcher had been guilty of issuing libelous circulars attacking the integrity of a judge or judges of the court of common pleas of Lucas County. The Court there held that while the power of disbarment should be exercised with caution yet where the respondent has been found guilty of unprofessional conduct involving moral turpitude and of misconduct affecting his character and standing as an attorney, courts will not hesitate to protect themselves from scandal and the public from prejudice by striking such person from the roll as an attorney. The Court in the Thatcher case, speaking through Davis, J., states at page 670:

"The proceeding is in its nature civil, and collateral to any criminal prosecution by indictment. The proceeding is not for the purpose of punishment, but for the purpose of preserving the courts of justice from the official ministration of persons unfit to practice in them. Undoubtedly, the power is one that ought always to be exercised with great caution; and ought never to be exercised except in clear cases of misconduct, which affect the standing and character of the party as an attorney. But when such a case is shown to exist, the courts ought not to hesitate, from sympathy for the individual, to protect themselves from scandal and contempt, and the public from prejudice, by removing grossly improper persons from participation in the administration of the laws."

In the case of **Schwartz v State of Ohio, 18 Oh Ap 373**, it is held:

"1. In Ohio a disbarment proceeding is purely statutory; it is a special proceeding of a summary character and it is neither an ordinary civil action nor a criminal prosecution, and is distinguishable from both with respect to the object sought and the procedure governing civil and criminal actions; it is an inquiry or investigation as to the conduct of an attorney, instituted by order of the court, not to mete out punishment to an offender, but to protect the administration of justice and the courts and the public from the misconduct of those who are licensed to practice law."

In the case of **In re Hawke, 107 Oh St 341**, Judge Wanamaker, delivering the opinion of the Court, says at page 349:

"We do not understand that when the Legislature confers a right upon a citizen of Ohio any court has an inherent right to arbitrarily, or for any cause other than that enumerated in a statute, deprive such person of such right, even though he be an attorney at law who is a quasi member of the court."

This Court regrets the necessity of examining into the conduct of a member of the bar to determine whether or not he is now fit to practice, but it is our duty to proceed im- partially and beyond the influence of sympathy and without being prejudiced by the fact that this action is being prosecuted by a distinguished group of the local bar, appointed for that purpose.

The bill of exceptions covers about 400 pages and we are frank to say that much of it is without pertinency as to the matters now before us and could well have been omitted from the bill of exceptions. If parties would confine the bill to the matters complained of, much eye strain and loss of time of the reviewing court would be avoided.

The charges against the respondent are definite. As before stated, only two specifications come before us, and we must endeavor to ascertain whether the allegations have been sufficiently proven to justify the imposition of the

heavy penalty of disbarment. We have no difficulty in realizing that one who has reached the age of this respondent and has been long associated in the practice of law will find difficulty in starting life anew in another field. However, we can not let such matters influence us.

A sympathetic view of the shortcomings of the lawyer is expressed by Spear, J., in the Thatcher case at page 675 and we may say that we are not without sympathy for the suggestions there made.

Considering the importance of this case to the respondent, we find it necessary to detail the evidence more at large than is ordinarily considered necessary. We have no hesitancy in saying that the evidence presents a rather wierd situation in refernce to those intimately connected with the case, and reflects discredit upon the defendant.

We will first direct our attention to the second specification, which is to the effect that an action was filed by Webster Baker v Harry E. Strader in which Strader was represented by Wysong. Real estate was sold under the order of the court and Wysong made application for the allowance of a homestead to Strader out of the proceeds arising from the sale. Strader had removed certain fixtures and chattel property from the real estate by reason of which he was cited for contempt. Wysong acted as his attorney and was present when the Court ordered a restitution of the chattel property and further ordered that the action for allowance of a homestead would not be passed upon until the order of the Court as to such restitution had been obeyed; that later, without waiting for the restoration of the property and with the knowledge that said restoration had not been made, Wysong presented an entry to a judge of the court of common pleas other than the judge who had ordered that the action for the allowance of a homestead should not be passed upon until the restoration of the property had been made. The claim is made that this entry was presented to the judge, whose approval was finally sought and obtained for the payment of the allowance of the homestead, without informing him of the prior order in reference to the restoration of the property and with intent to defraud the purchaser.

Such charge of misconduct is so susceptible to misinterpretation of the evidence by which it is attempted to be sustained, that we are not much impressed with it as a specification for disbarment. The trial court reached his conclusion, that the charge was sustained, on the ground that the trial court could not but conclude that if the judge approving the final entry had been fully informed, that he would not have approved an entry until he had permitted or caused an investigation to determine whether or not the conditions had been complied with.

Mr. Wysong's testimony in reference to the circumstances under which he presented the entry to Judge Hodapp may be epitomized: Judge Cecil was the judge who first made the order in reference to the restoration of the property and Judge Hodapp was the judge finally approving the entry. Upon presenting the argument for the allowance of the homestead exemption, Judge Cecil stated that there was no question but what Mr. Strader was entitled to the exemption. The question was then brought up about the property which was moved by Strader after the sheriff's sale. Whereupon the Judge stated, "I have nothing before me." The attorneys and the clients then left his office and later a proceeding was begun in contempt against Strader, which was finally heard, and Strader found guilty and the Judge stated that he would hold up the matter of the exemption for ten days and give Stader that time to return the property. Thereupon Wysong advised his client to return the property and states that three days later Strader called him and said, "I have moved it back. Now, when can I get my five hundred dollars? I need it, too." Wysong then informed Mr. Leonard, an attorney interested, that the property

was moved back and that he would present him with an entry. About a week later Strader came for his five hundred dollars. Strader made a half dozen trips to see Wysong and he testified that he had tried to get an entry complying with Judge Cecil's order and also a final distribution so that Strader could get his five hundred dollars. Strader came to his office and stated that he could not understand why he did not get what was coming to him. Thereupon Wysong asked him if he had returned the property to which he replied, "Yes, I returned the property just as you told me." Wysong thereupon went to the court house to take it up with Judge Cecil who was on his vacation and was informed that Judge Martin was taking care of his affairs during his vacation. He sought Judge Martin but his office was closed. He then went to Judge Krehbiel's office, but he also was out and then to Judge Hodapp's office and his office was closed. He went to Judge Mills' court and he was out for lunch. Leaving the court house, he met Judge Hodapp and stated that he had something important. Thereupon Judge Hodapp invited him to come into the office. Wysong stated that he had the former entry of partial distribution with him and explained the matter to Judge Hodapp in full and stated that Strader was in desperate circumstances to which the judge replied, "He ought to have that right away. Where is your entry?" He thereupon handed Judge Hodapp the entry with his name and Mr. Herchig's name. Judge Hodapp signed the entry and he secured a check for the $500.00 from the sheriff's office, payable to Strader and returning to his office gave it to Strader who cashed it. He states that he did not know Strader had not moved some rails that were under ten or fifteen tons of hay. Mr. Leonard later stated to him that Strader could get his money if he returned the property to which Wysong replied, "He has already returned the stuff." Leonard stated, "No, he hasn't." He told Leonard that there was an entry on (the one signed by Judge Hodapp).

This matter was before this Court in the contempt proceedings and this Court then was of the opinion that a great deal of the trouble in reference to the removal of the property arose out of a family quarrel and feud between the Straders and Griesey. It was a trifling matter and it is regretable that the time of busy courts should be taken up with a quarrel over some practically worthless property.

Wysong is contradicted by Leonard respecting his notification that an entry would be presented to him or to the court for approval.

Of course, if Strader told Wysong that the property had been restored, this would have been the basis of such representation to the court. As a prerequisite to the homestead exemption an entry should have been spread on the record purging Strader of his contempt. Without this entry of record, Wysong was not justified in preparing the entry releasing the exemption and presenting it to the court for approval until he had secured either the O. K. of the entry by counsel opposing Mr. Strader or proof that such counsel had seen the entry or knew that he was to present the matter to a judge of the Common Pleas Court.

We are constrained to repeat the truism that counsel should never tender an entry to a judge involving subject matter which has been at issue in a case unless and until he is prepared to establish that such entry has been seen by opposing counsel with opportunity to approve or disapprove. The safe and simple course to adopt in such procedure is to insist that opposing counsel, if he will not approve the entry, indicate in writing that he has seen it. We are greatly surprised to learn that an entry could be spread upon the record of the court without such formality being observed. Had it been followed in this case, the charge now under consideration would, in probability, have been avoided.

It may be noted that Judge Hodapp, who was best acquainted with the transaction in reference to the entry which he signed, was not called as a

witness to deny the statement of. Wysong, if it were not true. The only inference that can be made is that Wysong's statement was substantially correct and it does not appear that what he said was known or believed by him to be untrue. In this situation proof of guilt of conduct involving moral turpitude is not established.

Turning now to Specification No. 3, we find it involves the conduct of Wysong in reference to his professional activities while acting as attorney for Harry S. Grant and Isabelle Grant, the owners of certain real estate in Montgomery County. We have already stated, in substance, the allegations of the complaint.

### TESTIMONY OF HARRY GRANT McCORMACK

At the time he testified he was 75 years of age living in Lewisburg, Preble County, Ohio. He had formerly lived in Dayton and in Indianapolis. While living in Indianapolis he had become involved in a difficulty out of which a murder indictment arose against him in 1892. He was cleared of this charge. As a result of the murder indictment, he dropped the "McCormack" from his name and carried the name of Grant. Isabelle Grant McCormack is his wife, whom he married in 1922 in Dayton, her full name now being Isabelle Grant McCormack, but she used the name of Isabelle Grant. They owned, jointly, certain property on Carlisle Avenue in Dayton which they held in the name of Grant. They became acquainted with Wysong in 1922 when he acted as their attorney. They had no further business transactions with him until 1932. Grant was a real estate broker. Wysong came to him regarding property he had which he wished to dispose of, being a farm located in Jackson Township, Montgomery County. Wysong stated to Grant that he would like to trade the farm for the Carlisle Avenue property. There was a mortgage encumbrance on the Carlisle Avenue property amounting to $3100. In May, 1932, the exchange was agreed upon and the properties traded and

the farm was deeded to Grant and his wife, under the, name of Harry and Isabelle Grant. The Grants lived on the farm about three years commencing May 9, 1932. The title to the farm had been in the name of Goldie Wysong, a sisted of Drewey. About a week after the deed was made to Grant, Grant went to Wysong's office and made a deed to Mrs. Belle McCormack. Wysong made this deed. Wysong inquired who Belle McCormack was and Grant told him she was his sister living in Indianapolis. Grant had no sister by the name of Belle McCormack, but did have a sister, Mrs. Jennie Brockway living in Indianapolis. Grant stated that his reason for making the conveyance from the name of Grant to Belle McCormack was that they had been married under the name of McCormack and that some difficulty might arise if the title remained in the name of Grant. After this deed was on record, Wysong was at the farm a number of times. Later a man by the name of House came to the farm and told Grant that he had bought the property and gave Grant notice to move, after receiving which Grant consulted with Mr. Delscamp, an attorney, who filed a suit in Montgomery County attacking the deed under which House claimed the property, as a result of which suit the deed from Belle McCormack of Indianapolis was declared to be void and the property was restored to the Grants.

In the trade of the Carlisle Avenue property for the farm Grant gave a mortgage on another piece of property for $1000 and also a mortgage on the farm for $1500, there then being a mortgage on the Carlisle Avenue property of $3100. Afterwards Wysong informed him that there was a judgment against the previous owner for $2500 and a lien against the Carlisle Avenue property. Grant was indebted to a man by the name of Huffman for $2100 for which a cognovit note was given before he had traded the property. He had no knowledge that it had been reduced to judgment and a levy made. After the suit was decided in favor of Grant against

the claim of House, he remained on the farm until it was sold on foreclosure of the mortgage given to secure the purchase price. The farm was purchased by the daughter of Wysong on the foreclosure proceeding.

On cross-examination, Grant reiterated much of his evidence in chief, with elaborations. He stated after his indictment in Indiana for murder in 1892 he changed his name to Harry S. Grant and went from Indianapolis to Denver, where he lived 7 or 8 years and conducted a glass business under the name of Harry S. Grant. He returned to Ohio in 1914 with the woman who is his present wife, whose marriage was legalized in Montgomery County in 1922. He had been living with her as a common law wife, having met her in Denver. When he returned to Ohio in 1914, he was not married to her, but reiterated the statement that his marriage was legalized in 1922 in Montgomery County at which time he used the name of Harry Grant McCormack. His wife gave the name of Isabelle Slow.

There is some testimony in reference to the spelling of the name McCormack as against McCormick, which is apparently of no consequence.

The cross-examination develops some of the allegations of the petition. In the petition against House, wherein the deed from the Indianapolis Belle McCormack was declared to be void, there are allegations in respect to power of attorney which was executed in Richmond, Indiana by Belle McCormack of Los Angeles to Grant. McCormack's explanation was that he had a sister, Mrs. Brockway, who lived in Indianapolis part of the time and part of the time in California and it was stated that the residence of the person executing the power of attorney was California. Power of attorney was not made by the sister but by the wife. In answer to an interrogatory of the Court as to whether the witness was trying to create the impression that he had a sister by the name of Belle McCormack either in California or Indiana, the witness replied that they were living under the name of Grant and concluded that it would be best that the property should be in the wife's name, but when the power was drawn he was trying to create the impression that he had a sister by the name of Belle McCormack living in Los Angeles. The witness further states that the main reason for saying it was a sister was that they were having trouble with Wysong in regard to that property and that Wysong was endeavoring to get in contact with Mrs. McCormack and was trying to locate Belle McCormack. He stated that certain other property had been conveyed to his wife as "Grants" because they were legally married. In reference to the Carlisle Avenue property which was conveyed after the marriage, as to why it was not conveyed to McCormack, the witness stated, "We just naturally didn't think it required it at that time." Witness states that while he lived in Indianapolis he knew of no Belle McCormack and that there was no Belle McCormack except his wife.

## TESTIMONY OF ISABELLE McCORMACK

The testimony of Isabelle McCormack appears in the record, pages 33 to 54 and may be summarized: She is a widow residing in Indianapolis, Indiana, 63 years old. She had never been in Dayton, Ohio, had no property in Dayton, did not know the Grants or any one else who might have been connected with the property for which she signed a deed. She makes her living partly by washing and ironing.

While her testimony indicates she is of fair mentality, she has but a limited education. She at one time lived in Missouri and Texas and in rural counties of Indiana, having been born in that state.

In 1932 she was visited by Drewey H. Wysong at her home. She never knew him before and had never communicated with him. She stated that he wanted to know if he could get her interested in being a witness for him on some real estate. She replied that she did not know anything about any real

estate. He explained it saying he would take her to Mrs. Tucker's place and would give her a witness fee. Mrs. Tucker was a pharmacist and a notary public. On that occasion he asked her if she owned real estate in Montgomery County and she told him she did not and did not have any interest in it. At Mrs. Tucker's, Mr. Wysong had some papers he was drawing up and wanted her to sign them. He read the papers. She did not read all of them. They sounded all right to her. There was a deposition taken at the time which is in evidence. It might have been a year later when she saw Wysong again. He came to her house and conversed with her about the real estate in Montgomery County and again asked her whether she owned it or had any interest in it and she replied, "She did not". She again saw Mr. Wysong at her house after she had moved from her former residence. He had with him his wife and two other people. This was his third trip. He had papers he wanted her to sign and which he read to her. This third meeting was about two years after the first visit. She signed a paper, understanding that she was signing away; that she had no interest in the property and never had any. She did not read the paper. Mrs. Tucker acted as a witness and took her acknowledgment. This was March 30, 1934. Wysong stated that what she was signing had relation to the real estate. This was the last time she saw Wysong. He told her that the paper was to show that she did not have anything to do with the real estate and never had had.

The photostatic copy of the deed was then marked for identification. She identifies her signature as Belle Mc-Cormack. The deed is witnessed by Pearl Anderson Tucker and Albert Tucker. Wysong paid her $1.50 three different times, stating it was a witness fee. When her deposition was taken at the drug store on the second visit, there was a man by the name of Delscamp who had visited her at her house. Mr. Wysong was the only person who asked her any questions.

On cross-examination she denied the receipt of any letter from Wysong and repeats her former statements as to her place of residence, etc. She states that she was the only Belle McCormack living in Indianapolis. On Wysong's first visit she signed nothing. On the first visit he wanted to know whether she owned the real estate or had any dealings in it and stated that there was someone in Indianapolis by the name of Belle McCormack who had an interest in the real estate. She did not know the Grants and had never gone to Richmond to sign power of attorney. Wysong stated that he wanted her as a witness with regard to the real estate in Montgomery County. She stated that she knew nothing about it and never was in Dayton. Wysong came to her house and seemed to be in a big hurry and made inquiry as to whether she was Belle McCormack and asked her whether she ever lived in Dayton and stated that he would pay her a fee if she went to a notary public. She went with him to Mrs. Tuckers. On the second trip to Mrs. Tuckers, she signed the paper and answered a number of questions which were taken down. She states that it was on the third visit that Mr. Delscamp was present at a hearing. What she signed was a deed for property she had no interest in. Wysong read a part of it to her, she did not read it. She repeats that she had no property in Montgomery County and so informed Wysong, was willing to sign an instrument in order to get rid of being bothered. She admits that she signed the depositions. At the time of the taking of the depositions Wysong and Delscamp were both present. There is some confusion as to the time the depositions were taken.

### EXHIBIT

The deed signed by Belle McCormack and witnessed by the Tuckers was dated the 30th of March, 1934, and was a warranty deed warranting the title except as to a $1500 mortgage held by Goldie Wogaman and J. C. Wysong, subject to which the grantees take the property. The deed was filed for rec-

ord on the 5th of April, 1934. Deed was to John P. House.

EXHIBIT

The depositions were taken in the case of Goldie Wysong Wogaman v Harry S. Grant, et al, on the 30th day of March, 1934, in which the deponent Belle McCormack gives her place of residence, states that she does not know any other Belle McCormack living in Indianapolis, and the City Directory does not contain the name of Belle McCormack; that she did not give power of attorney or sell any property in Montgomery County before a notary public in Richmond, Indiana and did not authorize Harry S. Grant to act as her agent in the case pending in the Common Pleas Court of Montgomery County.

The other depositions spoken of are not in the record.

EXHIBIT

Record in Case of Harry S. Grant v. C. H. Appleton and John P. House

In this case the plaintiffs were named Isabelle Grant and Harry Grant and the allegation was made that defendant, House, claims to be the owner of the real estate. Plaintiffs assert they purchased the real estate in 1932 and shortly afterwards conveyed the property to Belle McCormack. It is alleged that since Belle McCormack has had legal title, she entered into a verbal lease with these plaintiffs from year to year beginning the first day of March, 1933; that on the 17th day of May, 1933, Belle McCormack who was the owner of the premises executed to Grant a power of attorney; that John P. House claimed to be the owner under a deed purported to have been executed by Belle McCormack, who never had any title to the property. Plaintiffs pray that the record of the transfer of the property on April 5, 1934, from Belle McCormack to John P. House be cancelled and that House be restrained from proceeding with the action in forcible entry and detainer. This petition was signed by Harry Grant on the 14th day of April,

1934 and Irvin C. Delscamp acted as his attorney.

An answer was filed by John P. House admitting that the plaintiffs purchased the property on May 9, 1932 and that on May 16, 1932, they conveyed the title to Belle McCormack. He denies the allegations as to the power of attorney to Harry S. Grant and alleges that Isabelle Grant appeared before a notary public and claimed that she was Isabelle McCormack and signed Bell McCormack's name to the purported power of attorney. Defendant avers that he has a legal title by warranty deed given by Belle McCormack for the real estate described in the petition. This answer is signed by John P. Hoover and D. H. Wysong, attorneys for defendant.

The cause came for hearing on the 11th of April, 1935, before Judge Clevenger sitting by assignment. The issues were found in favor of plaintiffs, that Harry S. Grant and Isabelle N. Grant are in fact Harry S. Grant McCormack and Isabelle N. Grant McCormack. The Court found that the warranty deed from Mrs. Belle McCormack to John P. House dated April 5, 1934, was invalid.

The Court found that Belle McCormack of Indianapolis who signed the deed to John P. House never had any right or title to the property, but that at all times the title to the property was in Belle McCormack of Montgomery County who was known as Isabelle N. Grant. The Court found that Isabelle N. Grant had the title. The deed from Belle McCormack of Indianapolis was declared void and of no force to convey the property to John P. House. The entry was endorsed by Delscamp, attorney for plaintiffs and Wysong, attorney for defendants.

TESTIMONY OF DREWEY H. WYSONG

D. H. Wysong gives testimony, Record page 258, et seq., on the third specification designated as the Grant-McCormack Charge.

After reciting the charge and the circumstances in reference to the obtaining of the deed from Belle McCormack and the suit in which the deed

was declared to be void, the witness is asked whether prior to March 30, 1934, he was informed that Isabelle Grant and Belle McCormack were one and the same person. The answer was to the effect that he did not know Mrs. Grant's right name was McCormack until they testified before Judge Clevenger. Witness stated that in 1933, Mr. Grant and his wife came to his farm and they reached an agreement as to exchange of property. He represented the Grants many years ago in regard to ·some property on Wolf Creek when they went under the name of Grant. The farm he exchanged for the property was in his sister's name and the property held by the Grants was in the name of the Grants. He made no examination as to the title. There was a mortgage of $3100 on the Carlisle Avenue property and some unpaid taxes on the farm. Other details are given in reference to that transaction.

A short time after the exchange, Grant stated to him that he wanted to transfer the property to his sister, Isabelle McCormack. Testimony is given in reference to a judgment against the Grants and a levy made on the Carlisle Avenue property that had been traded to him. Grant admitted that there was a judgment against him, which he had not reported to Wysong. Wysong conferred with Mr. Swaney, an attorney, in reference to the deed that Grant had given to McCormack, his claimed sister. Grant stated that the sister lived in Indianapolis for many years.

Charles Huffman brought an action to set aside the deed of the Grants to his claimed sister. Wysong went to Indianapolis and examined the directories and found where Mrs. Belle McCormack lived. The first trip was made in 1932 or spring of 1933. He finally found Mrs. McCormack lived with her daughter and son-in-law. He asked Mrs. McCormack if she knew Harry Grant or was any relation. Mrs. McCormack stated, "I hope to God they are not stirring up that matter". Not much information was elicited from Mrs. McCormack and he then talked to Pearl Anderson Tucker, the notary, and

made arrangements to take Mrs. McCormack's first deposition. He reported to Swaney and took the deposition. This was about the time of the third trip.

Wysong made another trip to Indianapolis and arranged to take depositions. The second trip was about a week after his first. Mrs. McCormack's second deposition is on file (only one deposition of Mrs. McCormack seems to be with the exhibits). The deposition was intended to be used in support of the answer and cross petition of the Wysong family in the Huffman case. Wysong testifies further about the depositions, but it is not of great importance.

Witness was inquired of whether he recalled statements made by Belle McCormack at the time her deposition was taken on March 22, 1933, that contradicted the statements she made as witness in this case. The witness answered that they were first when she stated, "I hope to God they aren't raising that case again", which statement she reiterated. After considerable argument, witness stated that after he took the deposition he wasn't satisfied and made another trip to Indianapolis. He was present at the trial before Judge Snediker and as a result of the testimony of the Grants he believed that Mrs. McCormack was the sister of Grant and that he is still positive that they are brother and sister. As a further reason for the belief, he stated that there was a physical resemblance between the two, stating they look alike, act alike and their conduct is very similar. He also relates conversation with her in the presence of her son-in-law in Indianapolis which aroused his suspicion. She stated when giving the deposition, "Well, if it will clear up the matter, that I won't be involved any more in the Dayton affair, why, I'll sign the deed", which statement he took to mean that she was afraid she would get mixed up in the deal that Grant brought about in the murder case which happened in 1892. He states that nothing is said in the deposition because he wasn't convinced about her being a sis-

ter until Grant testified that he killed a man.

The third trip was made in March, 1933, and the Huffman case was heard on the 24th of March, at which both Harry Grant and Mrs. Isabelle Grant testified as to their sister in Indianapolis. He states that he compared the signature of Belle McCormack appearing on the deed with the signature upon the power of attorney and various deeds and mortgages and he was positive that the same pen that wrote on the power of attorney the name of Belle McCormack, wrote the deed, from all of which he concluded that Mrs. Grant had Mrs. McCormack meet her in Richmond.

The Indianapolis Mrs. McCormack made affidavit that she did not go to Richmond. The affidavit is not produced. He testifies that he made a later trip to see Mrs. McCormack, stating that this was the 5th or 6th trip. He says that he told Mrs. McCormack that she was a sister of Mr. Grant, stating, "You look enough alike and you talk alike". He asked her what her maiden name was and she evaded the question, but her daughter said her maiden name was McCormack. Wysong asked how it came about that her name is McCormack now, to which the daughter replied, "She married McCormack".

When the suit was brought to foreclose the mortgage (Wogaman v Grant) service was sought by publication upon Mrs. McCormack stating resident was in Los Angeles, Indianapolis or Richmond. No official return of service was made, but witness got letter from Mrs. McCormack from Indianapolis in which she wanted to know why she was included in the foreclosure suit. He went back to Indianapolis with Mr. House and took another deposition, when the deed was obtained and when he told Mrs. McCormack that he thought she was still Mr. Grant's sister. Before he took the deposition, he asked her if she would sign a deed to clear the matter up, that he was not satisfied that she wasn't Mrs. McCormack, that is, Grant's sister. At that time the third deposition was taken. Wysong stated he gave

the McCormack deed to Mr. House and instituted the ejectment proceedings. When getting the deed from Mrs. McCormack he misrepresented no fact and his desire was to find out the truth of the matter. He states he thinks his conclusion was right, "If it is wrong I know it is a mistake of the mind and not of the heart."

On cross-examination, witness testified that the result of his visits to Indianapolis and consultations with Mrs. McCormack was that he obtained her signature to a warranty deed conveying the property in Jackson Township to Mr. John P. House. Witness testifies that he thought the Grants were using Mrs. McCormack to get out from under the execution of the judgment that Swaney had for Huffman. He stated that every action which he took, in connection with the deed, was calculated to bring the Huffman matter to a head and was to get the title clear and to show up what their object was. He was trying to fortify himself on Mr. Huffman's stand when the foreclosure came up. Witness still thinks that Mrs. McCormack is the sister of Grant or some connection. A question was addressed to him,

"Q. Knowing she told you both in your deposition and orally that she didn't have any interest in this property for which you had her sign a special warranty deed, what difference does it make whether she is his sister or whether she isn't?"

"A. I was positive she was the party Grant was using and Mrs. Grant was using."

Wysong figured that if Mr. and Mrs. Grant put any property in her name they were bound whether she knew it or not and if she deeded it back they would still be bound as the third party. At one time he thought Mrs. McCormack knew nothing of deed to her, but he now thinks she knew about it.

The witness explains the difference between his testimony during the trial and that given by him before the Bar Association and the causes for such

difference. He also stated that he wanted to find out the whole story and to be protected on the title of the property where he was representing his sister. Witness states that he believed when he got the signature of Mrs. McCormack of Indianapolis that she was the sister of Grant but that he wasn't as positive of it then as he is now.

The further cross-examination is a maze of questions and rather evasive answers which lead to no definite conclusion as to whether Wysong really believed Mrs. McCormack of Indianapolis was the McCormack to whom the deed had been made and a sister of Grant or whether he know or believed that she was a different individual. He, however, maintains himself in the belief that Mrs. McCormack was the sister of Grant and to whom the Grants' deed had been made and if he obtained a deed from her it would put him in an advantageous position in reference to property in which his sister had an interest and his client also an interest.

The Court addressed an inquiry to the witness, to the effect that he did not understand how the procuring of a deed would benefit the title any more than the foreclosure suit. His answer was "This was the reason for that, judge. We notified or I had her notified by mail—by publication—we had the clerk of this county send the letter to Los Angeles, California—one to Richmond and one to Indianapolis." Witness then received a letter from Mrs. McCormack stating that she did not want to have anything mixed up with the Grants, or something to that effect. Knowing that Mr. Delscamp represented the Grants he wanted to be sure about the title. The further question was, "How would that perfect your title whether you got service or did not on Belle McCormack, when she was made a party?" Answer was made, "Since it developed she claims she is Belle McCormack, I thought that would rather corner the matter and make it sure." Witness states that if he knew at that time what he knew now, he would never have had her sign the deed. He was not sure of his ground but if he had known what he now knows, he would have been certain that he would not have needed a deed. When he went out the second time to Indianapolis he figured it would be safer to have a deed from Mrs. McCormack. His intention was the very best. There may have been lack of knowledge on what a deed meant of that kind.

A Mr. Woods was offered as a witness for defendant but his testimony is not of importance. Mrs. Woods likewise was offered on inconsequential matters as were other real estate agents.

Mr. Paul, a deputy clerk in the Montgomery County Clerk's office testified in reference to the Huffman case and the depositions taken therein. The case was filed in 1932 and an answer and cross-petition was filed by Goldie Wogaman and other Wysongs. Service was not made on Belle McCormack by publication because not found. Depositions were filed in 1933 and were taken from the office by Delscamp who advised the Clerk that shortly after he had removed them from the files they had been turned over to the Bar Association. The witness attempted to trace the depositions but stated that it will bear further investigation. Further statements are made in reference to the depositions. The result was that the first deposition of Mrs. McCormack was not presented and is not before this court.

The Court has been put to tedious and exhausting lengths in the examination of this matter and is not sure that the circumstances presented by the evidence can be so marshalled as to present a definite picture of the actuating motives which prompted the accused to proceed as he did in this matter.

The Court below gave his reasons for arriving at his conclusion that the defendant was guilty and we commend the opinion to more extensive reading than the substance which we may extract from it.

The Court below pointed out that the accused attempted to excuse and account for his conduct in the McCormack matter by claiming that the McCormacks were attempting to practice

fraud and remove their property from the reach of creditors and the Court holds that even though this be true, it would not be a defense to the charge, if the action of the accused was misconduct. The Court states that it can readily see that there was nothing unreasonable about McCormack desiring to place property in the correct name; that while Wysong testifies that he was of the belief that Belle McCormack of Indianapolis was the real Belle McCormack, yet the court can see no reasonable ground for such belief. The mere fact that he found the name in the Directory, in face of the declaration that she had no interest in the property, for him to proceed further and procure her deed to a person who apparently had no interest, was misconduct and unprofessional conduct and the explanation of the accused as to why he desired the deed was not at all a satisfactory explanation in the opinion of the Court, and the Court finds him guilty.

In such a serious matter as the disbarment of an attorney, the Court should exercise the utmost caution to see that no injustice is done. The Court can readily realize that if the disbarment is allowed, it is the termination of the defendant's activities in which he has been engaged for a number of years. In the great play by the immortal bard, the Jew is made to say, "You take my life, when you do take the means whereby I live." On the other hand, the Court is in full realization that the integrity of the Bar must be maintained.

As we stated at the outset, the evidence presents a rather wierd situation. Before we can base our judgment upon the evidence of the accuser, he should be a person who could be readily believed. We have in this case the main witness, a Mr. Grant, who was not a Mr. Grant but a Mr. Grant McCormack, who admits that in Indianapolis, in 1892, he became so much involved in a murder case that he was indicted. Afterwards he claimed to have been acquitted but nevertheless the taint of the accusation was such as to lead him to change his name and go for 8 or 10 years to a rather remote city. While he was there he had some relations with a woman, who afterwards became his wife. We do not wish to be severe in our criticism for fear that it might reflect on a comparatively innocent woman, nevertheless, the evidence is to the effect that they lived together for a considerable period as man and wife and were only legally married in 1922, long after they returned to Dayton. In the marriage ceremony their correct names were used. They each were the owners of property in the name of Grant. For some reason, either through habit or carelessness or for the purpose of escaping the ghost of the past, they still used the name of Grant. In 1934 they had occasion to file a petition against Charles Appleton and John P. House, in which petition they still retained the name of Harry S. Grant and Isabelle N. Grant and it is there asserted that they purchased the property in question in May, 1932, and that on the 16th day of May they conveyed the title to Belle McCormack and that since that time Belle McCormack has had the legal title to the property; that she entered into a verbal lease with these plaintiffs from year to year beginning on the first day of March, 1933, and that on said yearly tenancy they were in possession on March 1, 1934 and that they entered into a contract with a third party in reference to the land; that Belle McCormack as owner of the premises executed to Harry Grant the power of attorney; they pray that the record of the purported transfer of the property from Belle McCormack to John P. House be declared void and that House be restrained in his suit for forcible entry and detainer; that the plaintiffs be relieved against forfeiture of the lease and that the lease heretofore set forth be adjudged the valid and subsisting lease.

We thus have as the main witness one who had at least been accused of murder, had concealed his identity by changing his name, had fled to a distant city where he lived in immoral relations with a woman whom he married when he returned to Dayton under her

proper name but which proper name was not used in the real estate transactions in which he was engaged. By that time the man was at least 70 years of age and while the mellowing influence of passing years should have inclined him toward honest dealing yet he filed a petition in the local court on October 1, 1934, which in itself is full of untruths and deceiving statements. He still seems determined to conceal the fact that Isabelle Grant, his wife, is not in fact Isabelle McCormack to whom the deed was made. The deed to Isabelle McCormack in itself is a deceptive document in that it appears to be a deed from a husband and wife to a third person, whereas, it is a deed from the husband and wife to the wife. He represented that Isabelle McCormack of Indianapolis was his sister. The power of attorney given in Richmond, Indiana, bears the same taint. It is true that Judge Clevenger found in his favor and also found and established that at all times the title to the property was in Belle McCormack who was known as Isabella N. Grant and that therefore said Isabelle N. Grant McCormack has the title to the premises. Whatever may have been disclosed on the trial of the case, it is patent that Grant deceived his own attorney and was willing to deceive the court as to facts which should have been disclosed. We can not look with much favor upon the testimony of such an individual nor give his evidence great weight in the solemn transaction of depriving a man of his livelihood.

The conduct of McCormack throughout the transactions appearing in the record is so tricky and his testimony so sharp that it compels us to look for corroboration elsewhere before accepting anything that he says. Of course, as the trial judge said, this conduct of the McCormacks is no defense for Wysong. Much of their misconduct, however, relates to the creation of a set of facts tending to lead one to believe that a Belle McCormack, resident of Indianapolis, Indiana, was the owner of the Wysong farm by deed from the Grants. When Wysong found the only Belle McCormack in Indianapolis he might have believed, had he relied only upon the information imparted by the Grants-McCormacks, that she was the person to whom they had made the deed.

On the other hand, Wysong tells the story that seems to us highly improbable. It is to the effect that after he made the deed from Grant to Belle McCormack,. who was stated to be a sister of the Grants and to be a resident of Indianapolis, he went to Indianapolis and searched her out and had at least five conferences with her. She testified that she, at an early time, told Wysong that she had no relatives in Dayton, that she owned no property in Dayton and had no interest in any property in Dayton. In spite of this apparently correct information, Wysong proceeded on the theory that she is, as a matter of fact the sister of Grant, and the one in whom the title to the real estate was lodged by the deed which he himself drew and witnessed. His excuse is lame and is to the effect that he discovered by virtue of the executions on the Carlisle Avenue property, which he had traded for his farm and also by virtue of the mortgage made to his sister or daughter, that he was under some compulsion to get a deed from the McCormack woman to John P. House. House appears in the picture only because he had been known to Wysong and had been employed by him. House was a farmer and later a plasterer who had done work of Wysong and who wanted to move out to the farm. Wysong told him that if the farm was bought back they would make a deal and that is the reason his name was put in this deed. That does not impress us as a very convincing statement, nor an act which comported with straightforward dealing. House was a man of no capital, paid nothing for the land and why Wysong should race back and forth to Indianapolis in order to get a deed signed by a phantom sister of the Grants is beyond our immediate comprehension.

We feel that the evidence on the whole is such that Wysong should not

go wholly unpunished but still is not of such weight as to justify his permanent disbarment. It is our judgment that he should be suspended from practice for a period of six months from and after July 1st, 1939.

Judgment accordingly.

HORNBECK, PJ., GEIGER & BARNES, JJ., concur.

**APPLICATION FOR REHEARING**

Decided July 26, 1939

BY THE COURT:

The above entitled cause is now being determined on two applications for rehearing, the first being the application of appellant and the second of appellee.

Short memoranda accompany each application.

We first consider the application of appellant.

The memorandum accompanying the application is really a reargument of the same questions presented originally. We find no good reason for receding from our original opinion, except on the question raised by counsel for appellee.

Appellant's application for rehearing will therefore be overruled.

Coming now to consider appellee's application for rehearing, we think the same should be sustained and our original finding therefore be modified.

After the original opinion was written, there was considerable delay before same was released, and inadvertantly we failed to change the date from which the six months' period of disbarment would start. Counsel are correct in their observation that the opinion mentioned July 1, 1939, as the date of starting the six months' period, and further that the opinion was not released until July 7, 1939.

The application for rehearing was not received until July 15, and there will be some further delay before the opinion on the applications will be released.

The original opinion will be modified so as to provide that the six months' disbarment period shall start from the date of the journal entry.

In all other particulars appellee's application for rehearing will be overruled.

HORNBECK, PJ., GEIGER & BARNES, JJ., concur.